UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Addy's Harbor Dodge, | ) | C/A No. 4:11-1065-RBH-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Global Vehicles U.S.A. Incorporated, John | ) | |
| A. Perez, and Manuel Baez, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

This litigation arises from a dispute concerning a contract between Plaintiff Addy's Harbor Dodge ("Plaintiff" or "Addy") and Defendant Global Vehicles U.S.A. Inc. ("Global"). Plaintiff sued Global as well as Global's former Chief Executive Officer, John A. Perez, and Global's former Chairman of the Board of Directors, Manuel Baez. Pending before the undersigned United States Magistrate Judge are the Renewed Motions to Dismiss of Defendants Perez (ECF No. 89) and Baez (ECF No. 93).[1] Plaintiff filed responses to both Motions, ECF Nos. 91, 95, and Defendant Perez filed a reply memorandum, ECF No. 93. For the following reasons, the undersigned recommends the Motions both be granted and the case be dismissed as to Defendants Baez and Perez. If the district judge accepts this recommendation, the litigation would continue as to Defendant Global only.

---

[1] When removed to this court in May 2011, all parties were represented by the same counsel. In July 2013, defense counsel of record were relieved from the representation of Defendant Perez. Defense counsel continues to represent Defendants Global and Baez. Because Perez is now appearing pro se, further pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Local Civil Rule 73.02(B)(2)(e), D.S.C, which provides that all pretrial proceedings involving litigation by individuals proceeding pro se be referred to a United States Magistrate Judge. *See* ECF Nos. 68, 72, 74. Because the pending motions to dismiss are dispositive, the undersigned enters this Report for the district judge's consideration.

I.      Background

On March 30, 2011, Addy filed its Complaint in the South Carolina Court of Common Pleas against all Global alleging the following causes of action: (1) Violation of Regulation of Manufacturers, Distributors and Dealers Act ("RMDDA") (S.C. Code Ann. § 56–15–10); (2) Breach of Contract Accompanied by a Fraudulent Act; and (3) Corporate Veil Piercing. Addy also alleged the following causes of action against Defendants Baez and Perez: (1) Violation of the RMDDA; and (2) Corporate Veil Piercing. Defendants removed the case to this court, answered, and filed a Motion to Dismiss on several grounds, one of which was that Defendants Baez and Perez should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) because the court lacked personal jurisdiction over them. The court denied that Motion to Dismiss, ECF No. 15, without prejudice and stayed the case so that the parties could mediate their dispute. *See* ECF No. 24. After several extensions of the mediation deadline and several interim procedural matters, the court ordered that the parties complete jurisdictional discovery[2] and refile any motions to dismiss for lack of personal jurisdiction no later than October 14, 2013. ECF No. 68. The court's July 9, 2013 Order also established amended scheduling deadlines, which remain in effect. *See id.* Baez filed his Renewed Motion to Dismiss on October 11, 2013; after receiving an extension, Perez, proceeding pro se, filed his Renewed Motion to Dismiss on October 24, 2013.

II.     Personal Jurisdiction: Standard of Review

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff ultimately bears the burden of proving to the district court judge the existence of jurisdiction

---

[2] The court found defense counsel would be relieved of representing Defendant Perez after he was deposed by Plaintiff. ECF No. 68. Plaintiff deposed Perez on July 22, 2013; it did not depose Baez. *See Baez Mem.* 2, ECF No. 82.

over the defendant by a preponderance of the evidence. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). However, when, as in this case, the court addresses the question of personal jurisdiction on the basis of "'motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge.'" *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (quoting *Combs*, 886 F.2d at 676). Upon such review, the court is required to "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676; *see also Stepheny v. Alvin S. Glenn Det. Ctr.*, C/A No. 8:06-2157-MBS, 2007 WL 542617 (D.S.C. Feb. 15, 2007).[3] Plaintiff must base his claim that personal jurisdiction exists on "specific facts set forth in the record." *Magic Toyota, Inc. v. Southeast Toyota Distributs., Inc.*, 784 F. Supp. 306, 310 (D.S.C. 1992). As the Fourth Circuit Court of Appeals explained in *Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56 (4th Cir. 1993), the court is to draw all "reasonable" inferences in favor of the plaintiff and is to look to the proof proffered by all parties in considering a Rule 12(b)(2) motion. *Id.* at 62. Nonetheless, the court "need not 'credit conclusory allegations or draw farfetched inferences.'" *Sonoco Prods. v. ACE INA Ins.*, 877 F. Supp. 2d 398, 405 (D.S.C. 2012) (quoting *Masselli & Lane, PC v. Miller & Schuh, PA*, No. 99-2240, 2000 WL 691100, at *1 (4th Cir. May 30, 2000)).

---

[3] A court's threshold finding that plaintiff has established a prima facie case of personal jurisdiction over a moving defendant does not settle that issue with finality, though. Rather, "'plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'" *New Wellington*, 416 F.3d at 294 n.5 (quoting *Prod. Group Int'l v. Goldman*, 337 F. Supp. 2d 788, 793 n.2 (E.D. Va. 2004) (internal citation omitted)).

III.     Relevant Facts

Addy is a limited liability company, organized and existing under the laws of the State of South Carolina. Compl. ¶ 1, ECF No. 1-1. Global is organized and existing under the laws of the State of Nevada with its principal place of business in Georgia. *Id.* ¶ 2. Perez is a resident of the State of Georgia, and Baez is a resident of the State of Florida. *Id.* ¶¶ 3-4. Defendants removed Addy's Complaint to this court, basing jurisdiction on diversity of citizenship. Removal Notice, ECF No. 1.

In its Complaint, Addy alleges that Global is authorized to do business in, and does business in, South Carolina. Compl. ¶ 5, ECF No. 1-1. Further, Addy avers that Global has "an enduring relationship with the State of South Carolina. *Id.* ¶ 6. Plaintiff alleges, on information and belief, that Baez and Perez "are the dominant shareholders of Global and Global is merely a façade for the operations of Baez and Perez." *Id.* ¶ 7. Addy submits the court has "general jurisdiction" over all Defendants pursuant to South Carolina's long-arm statutes, S.C. Code Ann. §§ 36-2-802, 36-2-803. *Id.* ¶ 8.

Addy is a licensed motor vehicle dealer located in Myrtle Beach, South Carolina. Compl. ¶ 10, ECF No. 1-1. On February 27, 2009, Addy paid Global $195,000.00 for a franchise to sell Mahindra vehicles.[4] *Id.* ¶ 15. On April 7, 2009, Plaintiff and Global entered into a Dealer Sales and Service Agreement ("Agreement"). *Id.* ¶ 16. Under the terms of the Agreement, Global Vehicles agreed to distribute Mahindra vehicles to the Plaintiff. *Id.* After signing the Agreement, the parties began to dispute performance issues. According to Addy's Complaint, at the time of entering into the Agreement, Global failed to disclose that its right to distribute Mahindra vehicles was contingent on approval from United States regulatory agencies, including the

---

[4] Mahindra vehicles are compact diesel pickup trucks that are built in India. Compl. ¶ 12.

National Highway Traffic Safety Administration ("NHTSA") and the Environmental Protection Agency ("EPA"). *Id.* ¶ 21. Further, the Complaint indicates Mahindra takes the position that Global's right to distribute Mahindra vehicles in the United States has expired. *Id.* ¶ 25. Global has not provided Plaintiff with "a single vehicle, part, or accessory for a Mahindra vehicle." *Id.* ¶ 27.[5]

IV.  Analysis

A.  Applicable Law

Federal courts exercise personal jurisdiction in the manner provided by state law, so the court must first consider whether South Carolina law would authorize jurisdiction over Perez and/or Baez. If South Carolina law would permit jurisdiction, the court must decide whether exercise of jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment. *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997). South Carolina's long-arm statute, S.C. Code Ann. § 36-2-803, has been interpreted to reach the outer bounds permitted by the Due Process Clause. *Id.*; *see S. Plastics Co. v. S. Commerce Bank*, 423 S.E.2d 128, 130 (S.C. 1992). Accordingly, the court's inquiry is whether the activities of Baez and Perez were such that the court's exercise of jurisdiction over them in this matter would comport with due process. *See Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996). To determine whether personal jurisdiction exists, the court must consider the facts in the light most favorable to Plaintiff. *Carefirst*, 334 F.3d at 396.

A court's exercise of jurisdiction over a nonresident defendant comports with due process when the defendant has "'minimum contacts' with the forum, such that to require the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial

---

[5] Facts specific to the relationship between Defendants Perez and Baez and Global are discussed within.

justice.'" *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)). The court's inquiry regarding whether personal jurisdiction exists varies "depending on whether the defendant's contacts with the forum state also provide the basis for the suit." *Carefirst*, 334 F.3d at 397. In such a case, the court will consider whether it has "specific" jurisdiction over the defendant by considering the following: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff['s] claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Id.* (quoting *ALS Scan v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711-12 (4th Cir. 2002)). In certain circumstances, South Carolina's long-arm statutes will permit personal jurisdiction over individual defendants based on actions of an individual nonresident employee, officer, or director of a corporation. *See Magic Toyota*, 784 F. Supp. at 314-15 (citing *Columbia Briargate Co. v. First Nat'l Bank,* 713 F.2d 1052 (4th Cir. 1983)).

Absent such "specific jurisdiction," the court may consider whether it has "general jurisdiction" over the nonresident. General jurisdiction exists when a defendant's contacts with the state are not the basis for the suit, but defendant's contacts with the state afford jurisdiction because they are "general [and] more persistent." *Carefirst*, 334 F.3d at 397. To establish such general jurisdiction, "the defendant's activities in the state must have been 'continuous and systematic.'" *Id.* (quoting *ALS Scan*, 293 F.3d at 712).

B.  The Court Lacks General Jurisdiction over Baez and Perez.

As Defendants note, Plaintiff's Complaint alleges only that the court has general jurisdiction over all Defendants. *See* Compl. ¶ 8. However, Baez and Perez argue the court has

neither general nor specific jurisdiction over them. Both claim they have not had sufficient "minimum contacts" with or within South Carolina to make the court's exercise of jurisdiction over them comport with due process. Baez Mem. 3, ECF No. 82; Perez Mem. 3, ECF No. 89.

In opposing the Motions of Baez and Perez, Addy effectively concedes this court would not have general personal jurisdiction over either of them based on their own contacts with South Carolina. *See* Pl.'s Resp. Baez 6, ECF No. 91; Pl.'s Resp. Perez 6-7, ECF No. 95 ("Plaintiff submits that this Court has personal jurisdiction over [Defendants] upon the theory that the corporate veil should be pierced as it relates to [Baez/Perez], and that the corporate Defendant's wrongful conduct should be attributable to [Baez/Perez] personally."). To the extent Plaintiff has not conceded no personal jurisdiction exists based on the contacts Baez and/or Perez had within South Carolina, the undersigned finds the Motions to Dismiss should be granted as to such theories of jurisdiction.

For the court to exercise general jurisdiction over a defendant, the defendant's contacts with the forum state must be "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). Any contact Perez or Baez may have had with South Carolina is not sufficient to establish general jurisdiction over them. Neither has ever lived in South Carolina. Baez Aff. ¶ 6, ECF No. 82-1; *see* Perez Dep. 4, ECF No. 89-1. Baez never traveled to the state to negotiate business transactions for Global or for himself personally. Baez Aff. ¶ 11. Perez traveled to South Carolina twice: once 25 years earlier to visit a friend in Charleston; and once to attend a mediation of this dispute. He has never been to the state to conduct business. Perez Dep. 91:21-92:2; Perez Mem. 4 n.2, ECF No. 89. Neither ever owned property or had a bank account in South Carolina. Baez Aff. ¶¶ 7, 9; Perez Dep. 92:3-6.

These facts, not disputed by Plaintiff,[6] do not demonstrate Perez or Baez had anything like the "continuous and systematic" contacts with South Carolina that would be required for this court to exercise general jurisdiction over either of them. *See Carefirst*, 334 F.3d at 397; *ALS Scan*, 293 F.3d at 712. Plaintiff has not made a prima facie showing that the court has general personal jurisdiction over either moving Defendant.[7] Accordingly, personal jurisdiction over Baez and Perez can be established only if their contacts with South Carolina were sufficient to confer upon the court specific jurisdiction over them.

C.  The Court Lacks Specific Jurisdiction over Baez and Perez.

Absent general jurisdiction, the court considers whether it has "specific" jurisdiction over Baez and/or Perez by considering the following: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff['s] claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst*, 334 F.3d at 39 (quoting *ALS Scan*, 293 F.3d 707, 711-12 (4th Cir. 2002)); *see also Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215-16 (4th Cir. 2001) (setting out same factors). Baez and Perez maintain they took no individual actions that demonstrate any contact with South Carolina relative to the agreement between Global and Addy. Accordingly, they submit Plaintiff has not made a prima facie showing that the court has specific personal

---

[6] In Plaintiff's response to Perez's Motion, it notes "the personal contact Perez has had with the State of South Carolina since the filing of this lawsuit." Defs.' Resp. Perez 11, ECF No. 95. In its memorandum, Plaintiff states that "[w]ithin the past year or so, Perez 'thinks' he offered a job to [an individual] who was 'in the Carolinas somewhere' when the job was offered." *Id.* Plaintiff offers no citation for this information. Even if this argument were supported by evidence, it does nothing to change the court's recommendation.

[7] In passing, Plaintiff cites to Perez's deposition testimony that Global hoped that the relationship between Global and Mahindra would be a "long term relationship . . . in all 50 states." *See* Perez Dep. 82:14-22, ECF No. 91-1. Personal jurisdiction over Global has not been challenged. This general statement by Perez does not confer jurisdiction over Perez and/or Baez.

jurisdiction over them based on their individual actions. Plaintiff's Complaint includes a cause of action for piercing Global's corporate veil and finding Baez and Perez personally responsible. Accordingly, Baez and Perez also move to dismiss for lack of jurisdiction because there is insufficient evidence to permit the court to look beyond the corporate formalities of Global and find Baez and/or Perez individually responsible for the alleged wrongs of Global. Baez Mem. 7-8, ECF No. 82; Perez Mem. 6-7, ECF No. 89. Baez and Perez contend the law of the state of Global's incorporation—Nevada—is to be considered when examining whether Global's corporate veil can be pierced.

In response, Addy acknowledges its theory of personal jurisdiction over Baez and Perez is based on piercing Global's corporate veil and attributing the allegedly wrongful conduct of Global to Baez and Perez personally. Pls.' Resp. Baez 6; Pls.' Resp. Perez 6-7. Plaintiff submits it has set forth a prima facie case of personal jurisdiction over Baez and Perez personally based on their relationships with Global and their involvement with the actions set out in the Complaint. Addy does not address Defendants' assertion that the court is to use Nevada law in undertaking the piercing-the-corporate-veil analysis, nor does it discuss the specific merits of its argument that Global's corporate veil should be pierced and any judgment against Global should also be entered against Baez and Perez individually.

The court appropriately may consider both approaches in determining whether personal jurisdiction will lie against Baez and Perez. *See Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 433 (4th Cir. 2011) (noting federal courts "'have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual . . . that would not ordinarily be subject to personal jurisdiction in that court when the individual . . . is an alter ego . . . of a corporation that would be subject to personal

jurisdiction in that court.") (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 n.18 (5th Cir. 2002)); *see also Columbia Briargate*, 713 F.2d at 1059-61. In *Columbia Briargate*, the Fourth Circuit Court of Appeals considered whether the so-called "fiduciary shield doctrine"[8] would keep a corporate employee, officer, or director from being haled into court for acts he or she undertook for the benefit of his or her employer. 713 F.2d at 1059-61. The *Columbia Briargate* court rejected a mechanical application of that doctrine, but found the more appropriate analysis of whether personal jurisdiction appropriately could be exercised over such a non-resident employee/officer is one that "manifestly harmonizes the rule with reference to the substantive tort liability of a corporate agent and that with reference to his amenability to service in an action for tort under a state long-arm statute[.]" *Columbia Briargate*, 713 F.2d at 1063-64. The court continued: "[S]o long as the agent has not participated in the alleged tort in the forum state, he is immune from suit on such tort both under general corporate law and under the state long-arm statute but if he has a 'direct personal involvement' in a tort committed in the forum state, the agent is subject to jurisdiction in that state under its long-arm statute." 713 F.2d at 1064.

The court stated the considerations as follows:

> [W]e are persuaded that when a non-resident corporate agent is sued for **a tort committed by him in his corporate capacity in the forum state** in which service is made upon him without the forum under the applicable state long-arm statute as authorized by Rule 4(e), he is properly subject to the jurisdiction of the forum court, *provided the long-arm statute of the forum state is co-extensive with the full reach of due process*. On the other hand, if the claim against the corporate agent rests on nothing more than that he is an officer or employee of the non-resident corporation and if any connection he had with the commission of the tort occurred without the forum state, we agree that, under sound due process principles, the nexus between the corporate agent and the forum state is too

---

[8] The "fiduciary shield doctrine" would not subject a corporate employee or agent to personal jurisdiction based solely on contacts with the forum state that were undertaken on behalf of their corporate employers/principals. *See Magic Toyota*, 784 F. Supp. at 314.

> tenuous to support jurisdiction over the agent personally by reason of service under the long-arm statute of the forum state.

713 F.2d at 1064-65 (bolded emphasis added; italicized emphasis in original). The allegedly tortious actions of the individual employee defendant in *Columbia Briargate* took place within South Carolina. 713 F.2d at 1065. The court left unclear whether an individual would be subject to jurisdiction in a forum in which he did not commit the alleged wrong. *See id*. at 1061. However, the Fourth Circuit offered some guidance on that issue, as noted by the court in *Magic Toyota*: "[The *Columbia Briargate* decision] favorably quoted the First Circuit, which held, '[w]hat is required is some showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury.'" 784 F. Supp. at 315 (quoting *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 907 (1st Cir. 1980)). As the First Circuit explained, "[c]ases which have found personal liability on the part of corporate officers have typically involved instances of direct personal participation, as where the defendant was the 'guiding spirit' behind the wrongful conduct, or the 'central figure' in the challenged corporate activity." 619 F.2d at 907 (internal citations omitted). In *Magic Toyota*, the court noted it would be "inconceivable that a corporate employee who cleverly refrains from committing tortious acts in the forum state can evade being haled into court there, while a less savvy employee, who commits the acts in the forum state, may be haled into court there, where both employees are acting on behalf of their employers with the purpose of injuring the plaintiff residing in the forum state." 784 F. Supp. at 315. The court noted that "[a]n agent who takes purposeful and calculated action against a plaintiff in a particular forum, fully conscious of the consequences of his actions, should be amenable to suit in that forum." *Id.*

Against this legal backdrop, the court considers the evidence presented by all parties regarding any connections between Baez and Perez and South Carolina that are related to the subject-matter of Plaintiff's Complaint.

The undisputed facts indicate that neither Baez nor Perez was involved personally with Addy. Neither was involved in the negotiations and contract between Global and Addy. Baez Aff. ¶ 13, ECF No. 82-1; Perez Dep. 76:10-16, ECF No. 89-1 (Perez testifying he did not know what anyone told Addy about Global and that he did not meet Addy until Addy and his attorney went to meet with him concerning this litigation); Perez Dep. 91:15-20 (Perez testifying he did not know who sold Addy the Mahindra dealership, nor did he know who sold any of the other dealerships in South Carolina). Baez had never communicated with any representative of the Plaintiff for any reason prior to this litigation, nor did he direct or manage any Global employees who did negotiate with Addy. Baez Aff. ¶¶ 14-15. Baez was not an officer of Global and "was never involved in the day-to-day operations of that entity." Baez Aff. ¶ 16. Baez gave testimony at the arbitration hearing between Global and Mahindra in London; he did not attend the entire arbitration. Perez Dep. 93:2-9, ECF No. 95-1. Baez was Chair of the Board of Directors of Global until he resigned his chairmanship in 2012. Baez Aff. ¶ 3.

Perez was the CEO of Global at the time the contract was entered between Global and Addy. However, Perez did not run Global on a "day-to-day basis;" the management team did. Perez Dep. 55:9-11. At its height, Global had 35 employees. Perez Dep. 104:23-24. Perez attended the London arbitration between Global and Mahindra on behalf of Global. Perez Dep. 93:7-9, ECF No. 95-1. Global, through CEO Perez, sent several letters to dealers, including Addy in South Carolina, to update them on the arbitration with Mahindra. *See* Perez Dep. 99:20-101:14 (regarding August 2010 letters), *id.* at 102:10-103:16; ECF No. 95-1. The contract

between Addy and Global contemplated that the law of the State of Georgia, not South Carolina, would govern any disputes under the Agreement. *See* Agreement Art. IX, ECF No. 82-3.[9]

Addy does not argue that either Baez or Perez was involved in negotiating the Agreement with Global or otherwise took actions in South Carolina related to this litigation. Instead, Addy argues Baez and Perez are subject to personal jurisdiction here because, in their capacities with Global, they were directly involved in tortious activities that were causally related to Addy's injury here.

In making this argument, Plaintiff first focuses on a corporation with which Baez and Perez were involved prior to the formation of Global. Plaintiff discusses the involvement of Baez and Perez with a prior corporation that was to distribute Cross Lander vehicles in the United States. Pl.'s Resp. Baez 7, ECF No. 91; Pl.'s Resp. Perez 7, ECF No. 95. Addy submits that, although that company was paid substantial sums of money from dealers for the Cross Lander franchises, no Cross Landers were ever delivered to the United States. Addy does not claim that it had purchased a Cross Lander franchise. Rather, the only connection Plaintiff makes is that other dealers lost money and were aware they would not be paid back. Addy submits Global was really the "same corporation" as Cross Lander because there was a "name change only." Pl.'s Resp. Baez 7-8, ECF No. 91; Pl.'s Resp. Perez 7-8, ECF No. 95.

Plaintiff also focuses on the agreement between Global and Mahindra in arguing Baez and Perez are subject to jurisdiction here. For example, Plaintiff provides excerpts of the deposition of Michael Huey, whom Global hired to sell Mahindra dealerships throughout the southeastern United States, including South Carolina. Huey Dep. 12:23-25, ECF No. 95-3. Huey

---

[9] *Cf. Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 281 (4th Cir. 2009) (noting inclusion of a choice-of-law clause in which the contracting parties agree the law of the forum state controls their dispute is but one factor the court may consider in determining personal jurisdiction in the forum state).

testified that, when working for Global, he never saw a copy of the agreement between Global and Mahindra. Huey testified he was not made aware that the Global/Mahindra agreement had contained contingencies until the deal between Global and Mahindra "went south" in 2010. *Id.* at 26:10-22. In particular, Huey testified he was made aware after the fact that, just as the deal between Global and Mahindra was being finalized,[10] Mahindra contacted Mr. Goetze [Bill Goetze, president of Global, *see* Perez Dep. 54:23-25] to add a contingency to the agreement. *Id.* at 27:1-9. In Huey's words, Mahindra "wanted like an escape clause that if they for some reason or another couldn't certify the vehicle for the U.S. that the parties would just walk out of the contract." *Id.* at 27:6-9. Huey said he was unaware of that clause when selling the Mahindra dealerships, but that he "also had no doubt that the [Mahindra] cars were coming." *Id.* at 15-19. When asked whether he would have informed prospective dealers of the contingency, Huey responded, "Perhaps." *Id.* at 27:20-24.

Plaintiff offers this testimony, arguing that "Global hired Mike Huey to sell these dealerships to various dealers around the southeast, including the State of South Carolina[,] and he was hired to do so, without being told by Baez and Perez that the Distributorship Agreement they had signed had a contingency provision that could possibly terminate the entire venture." Pl.'s Resp. Baez 8, ECF No. 91; Pl.'s Resp. Perez 9, ECF No. 95. Citing *Magic Toyota*, 784 F. Supp. at 315, Addy submits that by sending Huey into South Carolina but failing to apprise him of the contingency in the Distributorship Agreement between Global and Mahindra, Baez and Perez were attempting to "shield themselves personally from liability by hiring others to travel to South Carolina to commit the tort[i]ous act." Pl.'s Resp. Baez 8; Pl.'s Resp. Perez 8-9.

---

[10] Global and Mahindra entered into a Distributor Agreement in September 2006. *See* ECF No. 95-2 (excerpts of agreement). Based on the deposition testimony of Perez, it appears Global and Mahindra began discussions in/around 2005. *See* Perez Dep. 42:6-10, ECF No. 95-1.

The undersigned is of the opinion that Plaintiff has not set forth facts sufficient to indicate either Baez or Perez were the "guiding spirits" behind any allegedly tortious conduct on Global's part. As an initial matter, the court notes that Plaintiff omitted to mention in its memoranda that Huey was not involved in having Addy sign a dealer agreement concerning Mahindra, nor did he meet any one associated with the Addy family until after this litigation had begun. *See* Huey Dep. 32:23-24 (Huey did not sell to Addy), 32: 10-19 (Huey knew nothing about Addy family until meeting with John Addy before deposition in this litigation), ECF No. 93-2.[11] Although no one disputes that Huey had contacts within the state of South Carolina on behalf of Global, Huey is not involved in this litigation and the detailed discussion of Huey's deposition is of questionable value to the court in determining whether Plaintiff has established a prima facie case of jurisdiction over Baez and Perez.[12]

In discussing whether a corporate officer or director may be personally responsible and, as such, subject to the court's specific jurisdiction, the *Magic Toyota* court spoke of an "agent who takes purposeful and calculated action against a plaintiff in a particular forum, fully conscious of the consequences of his actions, should be amenable to suit in that forum." 784 F. Supp. at 315. The facts before the court simply do not indicate Baez or Perez took purposeful, calculated actions intended to harm Addy in South Carolina. Plaintiff apparently wishes to ascribe negative actions Perez and/or Baez may have taken concerning their move from being involved with a corporation to distribute Cross Landers to the complained-of wrongs that took place in South Carolina concerning Addy's Mahindra franchise. However, the only evidence Plaintiff has provided regarding Cross Lander is evidence through Perez's testimony that the

---

[11] Huey also testified that, although he had met Baez "two or three times," he "never even really had a conversation with him." Huey Dep. 40:17-24, ECF No. 93-2.

[12] The court is aware of no record evidence indicating that Perez and Huey ever spoke.

Cross Lander vehicle was never delivered because of issues with the Romanian government. Perez Dep. 40:18-21. Perez explained that those dealers who had purchased the Cross Lander franchises understood the distributor had lost its money and went to the dealers who asked they be brought another product to sell. Perez Dep. 43:1-7.

The evidence offers no indication Baez and/or Perez was trying to defraud Addy or anyone in South Carolina. *See Mylan Labs.*, 2 F.3d at 62 (court not limited to considering proof specifically proffered by plaintiff in considering prima facie case). Although the page of Perez's deposition cited by Plaintiff indicates there was a "name-change [from Cross Lander to Global] only," Perez Dep. 48:20-24, Plaintiff's argument wholly ignores other portions of Perez's deposition concerning the transition from Cross Lander to Mahindra. Perez testified that he refused to "bankrupt" Cross Lander and start another company because he "was not going to do that to the [Cross Lander] dealers." *Id.* 43:17-44:3. Perez explained he did not think it would have been fair to those who had purchased Cross Lander franchises to bankrupt the corporation and just start another company for distributing the Mahindra franchises/vehicles. *Id.* at 44:2-11. In fact, in Perez's deposition, he explained he had been working with "lawyers [] in Miami and lawyers trying to help the dealers recover their money because [he] care[s] about Mr. Addy" and "what Mahindra did is not right." Perez Dep. 84:3-7, ECF No. 93-3. Further, when Plaintiff's counsel told Perez during his deposition that they "are trying to figure out where $100 million went or $50 million," Perez responded:

> Go and look at the warehouse in 2010, 2009. IRS came in and did a full audit on every penny that went in and out. And guess what? This is how much we had to you know – zero. They sent us a letter saying you guys – they accounted for every penny.

Perez Dep. 84:18-24, ECF No. 93-3.

This testimony is not indicative of a corporate officer who was taking "purposeful and calculated action," *Magic Toyota*, 784 at 315, against Addy in South Carolina. The court is mindful that it is to "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676. Nonetheless, the court is to consider proof proffered by both parties, *see Mylan*, 2 F.3d at 62, and need not "credit conclusory allegations or draw farfetched inferences." *Sonoco*, 877 F. Supp. 2d at 404. When considering the proof offered by both parties—including the excerpts of testimony from the depositions of Perez and Huey, the affidavit of Baez, and the few pages of the agreement between Addy and Global placed in the record—the undersigned is of the opinion that Plaintiff has not satisfied its burden of setting forth a prima facie case of personal jurisdiction over Baez or Perez. Undisputedly, neither Perez nor Baez had significant contacts with South Carolina themselves. Even considering the relevant facts in the record in the light most favorable to Addy, Addy has not demonstrated the type of "direct, personal involvement" by Baez as Global's Chairman of the Board of Directors or by Perez as Global's CEO in any actions of Global that would be the type of "purposeful and calculated action against [Addy] in [South Carolina], fully conscious of the consequences" of their actions in South Carolina that would subject either of them to suit in South Carolina. *See Escude Cruz*, 619 F.2d 907; *Magic Toyota*, 794 F. Supp. at 315. Plaintiff's selective use of proffered excerpts of two depositions to make impassioned arguments regarding the acts of Baez and Perez do not suffice to satisfy Plaintiff's burden. *See Sonoco*, 877 F. Supp. 2d at 405.

The record simply does not support the conclusion that Baez or Perez could have reasonably anticipated being haled into courts in South Carolina. Accordingly, the court should not exercise of personal jurisdiction over them.

D.  Plaintiff has not Established a Prima Facie Case of Personal Jurisdiction Over Baez or Perez based on Piercing the Corporate Veil of Global.

The court also considers the related issue of whether Plaintiff has established a prima facie case that Baez and Perez were "alter egos" of Global, such that Global's corporate veil should be pierced and Global's contacts in South Carolina relating to this litigation should be imputed to Baez and Perez. Because Global is incorporated in Nevada, Nevada law concerning piercing the corporate veil is applicable. *See Montague v. Dixie Nat'l Life Ins. Co.*, C/A No. 3:09-687-JFA, 2010 WL 753342 (D.S.C. Feb. 26, 2010) (applying substantive veil-piercing law of the state of corporate defendant's incorporation) (citing *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999)). [13] Under Nevada law, "a stockholder, director, or officer is not liable for the debt of a corporation, unless the corporation is influenced and governed by the individual, the corporation and the individual are inseparable from each other through unity of interest and ownership, and adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice." *Webb v. Shull*, 270 P.3d 1266, 1271 (Nev. 2012); *see* Nev. Rev. Stat. § 78.747 (2001). As courts may consider these issues when considering personal jurisdiction, *see Newport News*, 650 F.3d at 433, the court briefly reviews facts raised by both parties regarding the viability of Plaintiff's attempt to pierce Global's corporate veil.

Baez is not himself a direct shareholder in Global. Baez Aff. ¶ 4. He is the "owner of Jedami Motorworks, LLC ('Jedami')[,] which owns approximately 40% of Global []." Baez Aff.

---

[13] The court notes that Plaintiff cites to South Carolina law regarding veil-piercing and does not address Defendants' correct assertion that Nevada law applies. *See* Pl.'s Resp. Baez 6. In any event, South Carolina's substantive law employs a similar test. *See, e.g., Sturkie v. Sifly*, 313 S.E.2d 316, 318-19 (S.C. App. 1984) (setting out two-pronged test: (1) an eight-factor analysis examining the "observance of corporate formalities by the dominant shareholders;" and (2) whether not piercing the corporate veil would create an "element of injustice or fundamental unfairness[.]").

¶ 4.[14] Jedami received no payments from Global, "in the form of dividends or otherwise, after the date on which the Dealer Sales and Service Agreement was signed and funds were paid by [Addy] to [Global]." Baez Aff. ¶ 17. Baez personally received a $1000.00 stipend when attending each of Global's semi-annual board meetings. During the course of Baez's involvement with Global "and its predecessor entities," he was paid approximately $12,000.00 for his services as Chairman of the Board of Directors. Baez Aff. ¶ 18. Global maintained its own bank accounts and employed its own accountants. At no time were Baez's personal records, or the records of Jedami, commingled with the accounts or records of Global. Baez Aff. ¶ 19. Baez indicates that, at all times, operations of Global were separate from his personal business and the business of Jedami. Baez Aff. ¶ 20.

Perez testified that "the last time he checked," which was in 2011, he owned "somewhere around 18" percent of Global. Perez Dep. 13:22-25, ECF No. 89-1. At the time Global was selling Mahindra dealerships, Perez's annual salary as CEO was $220,000. *Id.* at 54:9-14. Corporate minutes were taken at Global, and the Board of Directors had a committee that considered the salaries of Perez and other officers. *Id.* at 58:2-12.[15] Global never paid dividends to any of its investors or shareholders. *Id.* at 58:13-15. . Baez and Perez went to Paris,

---

[14] In his July 2013 deposition, Perez indicated Global was no longer an active corporation and that Baez was a "big shareholder," although Perez was unsure of what percentage of Global Baez owned. Perez Dep. 13:1-21, ECF No. 89-1. In the same deposition, Perez noted Baez himself was not the largest shareholder because he held stock through one of his companies. *Id.* at 14:13-23.

[15] Although testimony from Perez indicates some minutes were taken and retained, Perez Dep. 58, in its brief, Addy states: "Defendant has produced no corporate records from which to determine the corporation's adherence to corporate formalities, giving rise to the presumption that there may not be any." Pl.'s Resp. Perez 11, Pl.'s Resp. Baez 11. The burden is on Plaintiff to demonstrate a prima facie case for jurisdiction. There is no indication that Plaintiff requested corporate records from Global and were told none existed. To the contrary, based on the deposition excerpt provided by *Plaintiff*, the only record evidence indicates Global maintained corporate records of some type.

France and signed the original Distributor Agreement between Mahindra and Global on behalf of Global. Perez Dep. 56:18-20, ECF No. 95-1.[16]

Plaintiff points out that, while Baez was Global's Chairman of the Board and Perez was CEO, none of the money generated from selling Mahindra franchises, including those in South Carolina, was placed in escrow. Pl.'s Resp. Baez 9, ECF No. 91; Pl.'s Resp. Perez 9-10, ECF No. 95 (both citing Perez Dep. 27:5-14, ECF No. 95-1)).[17] Plaintiff couples this with testimony from Perez that Global had generated $35,000,000 from the sale of Mahindra dealerships, although the Global venture with Mahindra was expected to cost approximately $30,000,000. Pl.'s Resp. Baez 9, ECF No. 91; Pl.'s Resp. Perez 10, ECF No. 95 (both citing Perez Dep. 51:25-52:3, 53:16-23; ECF No. 95-1)). Plaintiff submits this indicates Global was "grossly undercapitalized." Pl.'s Resp. Baez 9, ECF No. 91; Pl.'s Resp. Perez 10, ECF No. 95. Plaintiff also points to Perez's salary as CEO as demonstrating monies were being "'siphoned off' by a dominant shareholder," claiming that is another reason Global's corporate veil should be pierced. Pl.'s Resp. Baez 10; Pl.'s Resp. Perez 10-11.

Construing all facts and reasonable inferences in the light most favorable to Addy, as it must, the undersigned is of the opinion Addy has not set forth facts from which reasonable inferences may be drawn that set out a prima facie case that either Baez or Perez is or was an "alter ego" of Global. Plaintiff has not provided evidence sufficient to a prima facie case that Global's corporate veil should be pierced. To set out such a case, Plaintiff would need to lay a

---

[16] Plaintiff attaches several pages of the Distributor Agreement, and notes that Perez and Baez signed the Agreement "individually," as did their spouses. *See* ECF No. 95-2. The court notes, though, that these signatures relate specifically to specific sections of the Distributor Agreement. Because Plaintiff did not put the entire agreement into evidence, the court cannot consider whether these signatures might somehow bolster Plaintiff's prima facie case.

[17] Baez and Perez do not dispute the monies were not escrowed; however, Baez points out the contract between Global and Addy contained no escrow requirement. *See* Dealer Sales and Service Agreement, ECF No. 82-3.

foundation that could show Baez and/or Perez and Global are "inseparable from each other through unity of interest and ownership," or that "adherence to the corporate fiction of a [Global as] a separate entity would sanction fraud or manifest injustice." *Webb*, 270 P.3d at 1271. Importantly, too, alter egos must "control" the corporations. *See id.*

The evidence before the court does not provide prima facie evidence in support of Plaintiff's position that either Baez or Perez is a dominant/controlling shareholder of Global. As evidenced by the affidavit of Baez and excerpts of Perez's deposition, Global was a separate entity operated and audited by numerous persons. The only record evidence is that Perez owned somewhere around 18% of Global. Perez Dep. 13:22-25, ECF No. 89-1. Baez individually is not himself a direct shareholder in Global, but owns Jedami, "which owns approximately 40% of Global []." Baez Aff. ¶ 4. Global had a board of directors and officers who managed the corporation and made decisions. The only evidence of record is that Global observed corporate formalities. Further, an IRS audit of Global revealed no accounting irregularities. Unlike in the *Newport News* case cited by Plaintiff, the evidence here does not indicate Perez or Baez did not have a "separate identity" from Global. Further the evidence does indicate Global had more than one decision maker. *Cf. Newport News*, 650 F.3d at 433 (affirming trial court's piercing of corporate veil under Virginia corporate law and exercising jurisdiction because there was no separate identity between individual and corporate entity, individual was only board member and only one responsible for corporate decisions).

Based on such evidence, "adherence to the corporate fiction" would not "sanction fraud or promote a manifest injustice." *See Webb*, 270 P.3d at 1271. Accordingly, the undersigned is of the opinion that Plaintiff has not put forth a prima facie case that Global's corporate veil could be pierced so that Baez and/or Perez as "alter egos" would be subject to individual responsibility for

Global. Accordingly, personal jurisdiction is not available over Baez and/or Perez based on this theory. The Motions to Dismiss of Baez and Perez should be granted.

V.    Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Motions to Dismiss of Baez and Perez (ECF Nos. 82, 89) be *granted*. If this recommendation is accepted, the case will proceed against Global Vehicles, U.S.A. only.

IT IS SO RECOMMENDED.

December 12, 2013                                    Kaymani D. West
Florence, South Carolina                            United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**