UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Addy's Harbor Dodge, LLC, | ) | C/A No. 4:11-1065-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Findings of Fact and Conclusions of Law |
| | ) | |
| Global Vehicles U.S.A. Incorporated, | ) | ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

This litigation arises from a dispute between Plaintiff Addy's Harbor Dodge, LLC ("Plaintiff" or "AHD") and Defendant Global Vehicles U.S.A. Inc. ("Global"). Plaintiff initially sued Global as well as Global's former Chief Executive Officer, John A. Perez ("Perez"), and Global's former Chairman of the Board of Directors, Manuel Baez. The court dismissed Perez and Baez, finding no personal jurisdiction over them. ECF No. 114. On July 25, 2014, the parties consented to have the undersigned conduct all proceedings, including trial. ECF Nos. 124, 125. The parties consented to a nonjury trial. ECF Nos. 126, 127.

The matter is now before the court following a bench trial held on September 15, 2014. Having considered the testimony of the witnesses, both in-court and by way of deposition; the exhibits; and arguments of counsel; the court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

As discussed more fully below, the court orders judgment be entered in favor of AHD.

I.     Background

Plaintiff's Complaint includes a claim for violation of the Regulation of Manufacturers, Distributors, and Dealers Act, S.C. Code Ann. § 56-15-10, *et seq.* (the "Act"); a claim for breach

of contract accompanied by a fraudulent act; and a cause of action to pierce the corporate veil. Compl., ECF No. 1-1. At trial, Plaintiff elected to pursue remedies under the Act only, dismissing the claim for breach of contract accompanied by a fraudulent act. Further, the parties agreed that the court's prior order dismissing Defendants Perez and Baez, ECF No. 114, ended the claim for piercing the corporate veil. Accordingly, only the statutory cause of action is before the court for trial.

At the start of the trial, the parties' 18 trial exhibits were introduced without objection and were marked as "Joint Exhibits." Plaintiff called three witnesses. Global's former CEO, Perez, testified by deposition, as did Michael S. Huey ("Huey"), who sold automobile franchises on behalf of Global and its predecessor company. AHD's principal, Michael S. Addy ("Addy"), testified in person. Defendant did not call any witnesses.

II.     Findings of Fact[1]

1.  Addy's Harbor Dodge, LLC ("AHD") is a limited liability company ("LLC"), organized and existing under the laws of the State of South Carolina. Addy Tr. Testimony.

2.  Global Vehicles U.S.A. Incorporated ("Global") is a corporation organized and existing under the laws of the State of Nevada. Compl. ¶ 2, ECF No. 1-1; Answer ¶ 2, ECF No. 6; and Global's Complaint filed against Mahindra & Mahindra, LTD ("Mahindra"), was filed in the United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1-10-CV-01818-JOF, ¶ 17.[2]

3.  Global was authorized to do business in South Carolina, did business in South Carolina, and maintained a registered agent in Richland County, South Carolina. Compl. ¶ 5; Answer ¶ 5.

---

[1] In reaching its Findings of Fact and Conclusions of Law, the court has relied only on those exhibits that were admitted into evidence and the testimony to which no party objected or to which an objection was overruled by the court.

[2] The Global Complaint and exhibits thereto were entered without objection as Joint Exhibit 1 in the matter before this court and is hereinafter referred to as "G.V. Compl." Reference to "Complaint" or "Compl." herein otherwise refers to AHD's Complaint filed in this matter. ECF No. 1-1.

4. John A. Perez ("Perez") established LaCaro Auto Distributors, Inc. ("LaCaro"), a Nevada corporation, on June 30, 1999.[3]  Perez Dep. 29; Nev. Secretary of State records (for Global Vehicles U.S.A. Incorporated), *see* https://www.nvsilverflume.gov/business (*search for* "Global Vehicles U.S.A. Incorporated") (last visited Sept. 24, 2014).

5. Perez was the sole shareholder of LaCaro. Perez Dep. 29.

6. LaCaro was established to import ARO "off-road utility vehicles" from Romania for distribution in Latin America. Perez Dep. 30-31, 33.

7. Perez testified that LaCaro actually distributed ARO vehicles in Latin America from 1998-2002. Perez Dep. 30.

8. On July 31, 2003, LaCaro filed a certificate of amendment with the Nevada Secretary of State to change its corporate name to Cross Lander U.S.A. ("Cross Lander"). Perez Dep. 30; Nev. Secretary of State records (for Global Vehicles U.S.A. Incorporated), *see* https://www.nvsilverflume.gov/business *(search for* "Global Vehicles U.S.A. Incorporated") (last visited Sept. 24, 2014).

9. Cross Lander was located at 3575 Northwest 72nd Avenue in Miami, Florida. Huey Dep. 10.

10. Perez decided to start bringing ARO vehicles through Cross Lander to the United States. Perez Dep. 35-36; Huey Dep. 4-8.

11. At that time, Perez along with Manuel Baez and a few other friends and family were the shareholders of Cross Lander. Perez Dep. 36.

12. Cross Lander began selling franchises to motor vehicle dealers in the United States; dealers would pay a fee of "somewhere between $25,000 and $50,000" to sell Cross Landers. Perez Dep. 37-38.

13. Huey, an independent contractor with Cross Lander, visited existing automotive dealerships and tried to enroll them as Cross Lander dealers. Huey Dep. 11, 19.

---

[3] Although Perez's deposition testimony indicates LaCaro was incorporated in 1998, business records indicate the year was 1999. In any event, this one-year difference in dates is not material to the court's other findings or to the conclusions of law or order entered herein.

3

14. Huey sold 100 Cross Lander franchises to dealers, including a few in South Carolina. Huey Dep. 11, 14, 20.

15. Cross Lander utilized the monies generated from the Cross Lander dealers to operate the Cross Lander corporation. Perez Dep. 39.

16. A dispute arose between Cross Lander and the Romanian customs agency in 2005. Perez Dep. 34, 38-39.

17. Cross Lander did not import any Cross Lander vehicles into the United States. Compl. ¶ 13; Answer ¶ 13; Perez Dep. 38.

18. Perez testified that when Cross Lander lost all of the money it had obtained from the dealers; he went to the dealers, who "said, okay, just bring us another product." Perez Dep. 43. Perez said he "guess[ed] it's how Mahindra started." Perez Dep. 43.

19. Prior to terminating its relationship with ARO, Cross Lander began discussions with Mahindra, a company incorporated and registered under the Indian Companies Act of 1913, about distributing Mahindra's vehicles in the United States. Perez Dep. 34, 40; G.V. Compl. ¶ 2.

20. Cross Lander's relationship with ARO ended in 2005. Perez Dep. 33-34.

21. Cross Lander changed its name to Global Vehicles U.S.A., Incorporated. Perez Dep. 43-44.

22. Global moved its offices to 1720 Windward Concourse in Alpharetta, Georgia. Perez Dep. 96, 111; Huey Dep. 31.

23. In early 2006, Global and Mahindra commenced negotiations for the appointment of Global as the exclusive distributor of Mahindra vehicles in the United States. G.V. Compl. ¶ 23.

24. Global and Mahindra executed a Letter of Intent on January 20, 2006, and a Memorandum of Understanding on March 10, 2006. G.V. Compl. ¶ 24.

25. In 2006, Mahindra gave Global the go-ahead to start negotiating exclusively. Perez Dep. 34.

26. Ultimately, on September 28, 2006, Global and Mahindra executed a comprehensive Distributor Agreement. G.V. Compl. ¶ 25.

27. This Distributor Agreement granted Global the exclusive right to distribute Mahindra vehicles in the United States for an initial term of ten years, with an optional renewal term of five additional years. G.V. Compl. ¶ 26; Perez Dep. 82.

28. The Distributor Agreement between Global and Mahindra provided that failure to achieve certification to meet U.S. emissions and safety standards, a process called "homologation", by August 31, 2009, would render the agreement void. G.V. Compl. ¶ 4, and ex. A thereto ¶ 10.

29. Perez was very familiar with the "homologation" process from his previous dealings with Cross Lander. Perez Dep. 35-36, 124.

30. Pursuant to the Distributor Agreement, Global appointed approximately 350 dealers to sell Mahindra vehicles throughout the United States, generating over $60,000,000 in franchise fees. G.V. Compl. ¶¶ 7, 27 & n.6; Perez Dep. 53.

31. Some of those dealers were in South Carolina. Huey Dep. 11-12, 29, 34.

32. Huey testified he had no franchise disclosure information and therefore did not provide same to any dealers with whom he dealt in South Carolina. Huey Dep. 16-18.

33. None of the money collected in franchise fees was placed in escrow. Perez Dep. 25-27, 54.

34. Although Perez projected that Global would incur approximately $20,000,000 in expenses before the first Mahindra vehicle arrived in the United States, Global's shareholders had only invested $4,000,000 or $5,000,000. Perez Dep. 51-52.

35. Global's business plan was to use the money generated from the future sale of Mahindra franchises to pay the $9.5 million due Mahindra and to use the rest for Global's operations. Perez Dep. 50-51.

36. At the time of execution of the Distributor Agreement, Global and Mahindra contemplated that the first model of Mahindra vehicles designed for importation into the United States would be available for shipment in August 2008, with subsequent models available in August 2009, and in the fourth quarter of 2010. G.V. Compl. ¶ 28.

37. Pursuant to a First Amendment to Distributor Agreement executed on April 20, 2007, the "homologation" deadline was extended to March 31, 2010, and the dates when Mahindra vehicles would be available for shipment were delayed to January-March 2009 for the first model, September 2009 for the second model, the end of 2009 for the third model, and January-March 2011 for the fourth model. G.V. Compl. ¶¶ 29, 33, & ex. B-1 thereto at 1, 5.

38. In 2008, in anticipation of the availability of Mahindra vehicles for shipment by early 2009, Global engaged in the process of securing from established financial institutions the required financing for the purchase of the initial vehicle order. G.V. Compl. ¶ 34.

39. However, after the launch of the vehicles was delayed beyond the anticipated January-March 2009 time frame, those financial institutions ceased negotiations with Global due to the uncertainty of the launch date. G.V. Compl. ¶ 35.

40. Casey McGraw ("McGraw") was one of Global's representatives who sold franchises to dealers. Perez Dep. 66.

41. McGraw was a vice-president of sales for Global. Perez Dep. 67, 98.

42. Addy, principal of AHD and manager of the LLC, first heard of Global in January of 2009. He had seen Global's advertisements in *Automotive News*, an industry trade magazine, and he received a mailing circular from Global. Addy began receiving phone calls on behalf of Global from McGraw in early 2009. Addy Tr. Testimony.

43. McGraw was Addy's primary contact with Global. Addy Tr. Testimony.

44. McGraw gave Addy some biographical information on Global's officers and several others who worked with Global. Addy Tr. Testimony.

45. Addy credibly testified he was not given any information about Global's financial standing. Addy Tr. Testimony.

46. Addy testified that, during this early-2009 time period, he was looking for additional franchise opportunities given the uncertainty of whether he might lose existing franchises because of Chrysler, LLC's then-uncertain future. Addy Tr. Testimony.

47. Neither McGraw nor anyone else on behalf of Global told Addy about the "homologation" contingency in the Distributor Agreement between Global and Mahindra. Addy Tr. Testimony.

48. Neither McGraw nor anyone else on behalf of Global told Addy that the original date when Mahindra vehicles were to be shipped from India to the United States had passed and that the extended date referred to in the First Amendment to Distributor Agreement was in serious jeopardy. Addy Tr. Testimony.

49. Neither McGraw nor anyone else on behalf of Global told Addy that the financial institutions on which Global had counted to finance the purchase of the initial vehicle order had already ceased negotiations with Global due to the uncertainty of the launch date. Addy Tr. Testimony.

50. On February 27, 2009, AHD issued its check in the amount of $195,000.00 made payable to Global as payment that was due for the Mahindra dealer franchise package. Jt. Ex. 2; Addy Tr. Testimony.

51. On February 28, 2009, Addy signed a Letter of Intent (LOI) to enter into a Dealer Sales & Service Agreement with Global for a Mahindra dealership. Jt. Ex. 3; Addy Tr. Testimony.

52. On the same date, Addy signed a Letter of Understanding. Jt. Ex. 4; Addy Tr. Testimony.

53. The Letter of Understanding set forth requirements of a $200,000 Floor Plan Letter and an Irrevocable Stand-by Letter of Credit for $500,000, both of which were to be provided by AHD to Global upon notice from Global and/or 180 days prior to receiving vehicles. Jt. Ex. 4.

54. As Addy explained at trial, a "floor plan" is a third-party financing source that is used to pay for vehicles ordered before the vehicles are shipped. Addy Tr. Testimony. The Floor Plan Letter required was a letter from the financing source confirming the dealer has the financing in place.

7

55. On March 9, 2009, Addy signed an Application for Dealer Agreement including a Background Authorization. Jt. Ex. 5; Addy Tr. Testimony.

56. On March 9, 2009, AHD forwarded the LOI, Letter of Understanding, Application for Dealer Agreement, and Background Authorization to Global. Addy Tr. Testimony.

57. On March 18, 2009, Global approved and accepted AHD's LOI and signed AHD's Letter of Understanding. Jt. Exs. 3, 4.

58. Addy signed the Dealer Sales and Service Agreement ("DSSA") on behalf of AHD as its president. Jt. Ex. 6; Addy Tr. Testimony.

59. On April 7, 2009, Global signed the DSSA. Both signatories also initialed each page of the agreement. Jt. Ex. 6.

60. The DSSA states that Global has the exclusive United States rights to distribute, sell, and service vehicles manufactured by Mahindra, including Parts, Tools and Accessories; that the vehicles, parts and accessories are sold to the public and serviced primarily by dealers; that Global shall assist by providing sales and merchandising programs designed to help dealer in the sale and service of vehicles, parts and accessories; and that sales, service, and parts specialists of Global are available to assist dealer and provide counsel and advice towards the conduct of the dealership on a successful basis. DSSA 1-2, Jt. Ex. 6.

61. The DSSA incorporated by reference the Dealer Operating Standards and Standard Provisions ("DOSSP"). DSSA, art. III, Jt. Ex. 6.

62. At trial, Addy agreed with opposing counsel that Article III of the DSSA made the DOSSP part of the DSSA. Addy Tr. Testimony.

63. Addy testified that he had never been presented with a copy of the DOSSP. Addy Tr. Testimony.

64. In Article III of the DSSA, AHD acknowledges the agreement with Global includes the DOSSP, "which have been read and agreed to both by Global Vehicles and [AHD]," and are "made a part [of the DSSA], and are incorporated herein with the same force and effect as if set herein in full." DSSA, art. III, Jt. Ex. 6.

65. The DOSSP provides in part as follows:

    **J. Failure or Delay In Filling Orders**
    Distributor [Global] shall not be liable for any failure or delay in delivery or shipment of orders for any Global Vehicles Products where such failure or delay is due, in whole or in part, to non-receipt of said products from the Manufacturer or other supplier thereof or to shortage or curtailment of labor, material, transportation, or utility services, strikes, labor disputes, or other labor difficulties in connection with the operators of Distributor, Manufacturer or any other person, Acts of God, government acts or regulations, fire or other casualty, civil commotion, or to any cause beyond the control of Distributor.

    DOSSP, art. II, para. J; Jt. Ex. 18.

66. None of the 2009 deadlines for shipping vehicles from Mahindra to Global was met. G.V. Comp. ¶ 29 n.8.

67. The "homologation" deadline between Global and Mahindra was extended a second time to May 31, 2010, and a third time to June 11, 2010. G.V. Compl. ¶ 14 n.2, ¶ 33.

68. Global never advised Addy that the homologation deadline had been extended on any occasion. Addy Tr. Testimony.

69. Beginning in May 2009, Mahindra made a demand for adequate assurance of Global's financial ability to perform. G.V. Compl. ¶¶ 36-41.

70. Regarding any delays in shipments of Mahindra vehicles to AHD in the United States, Addy testified he was constantly advised that "approvals were imminent and that [AHD] would be receiving vehicles within the next few months." Addy Tr. Testimony.

71. As set out in the GV Complaint, on July 17, 2009, Global received correspondence from Mahindra indicating that Mahindra would not be meeting its projected December 2009 vehicle launch date and that it was putting "on hold" its plans to manufacture vehicles for sale in the United States "due to Global's purported failure to secure financing for the purchase of such vehicles." G.V. Compl. ¶ 42 & ex. D thereto.

72. In the GV Complaint, Global averred it "did have sufficient financing in place to secure its vehicle orders per the Distributor Agreement [between Global and Mahindra]," and claimed Mahindra's refusal to fill orders based on Global's purported failure to secure financing was "pretextual." G.V. Compl. ¶¶ 43, 46.

9

73. Global proceeded with submitting successive orders for vehicles, both of which were rejected by Mahindra. G.V. Compl. ¶¶ 43-56.

74. Addy was not advised of the dispute between Global and Mahindra. Addy Tr. Testimony.

75. Addy testified that, pursuant to the agreement with Global, AHD was allocated 40 Mahindra vehicles. Addy Tr. Testimony. On June 5, 2009, Global confirmed AHD's initial vehicle order for 14 vehicles. Jt. Ex. 7.

76. AHD placed two additional orders for Mahindra vehicles: two were ordered August 7, 2009; and on August 10, 2009, AHD placed a vehicle order for the balance of the 40-vehicle allotment. Addy Tr. Testimony; Jt. Exs. 9-10.

77. Global accepted AHD's orders of Mahindra vehicles; encouraged AHD to buy over $12,000 in Mahindra signage; requested the Floor Plan Letters of Credit with the June and August 2009 vehicle orders; and continued to represent that a "launch" of Mahindra vehicles was imminent. Jt. Exs. 7, 9, 10; Addy Tr. Testimony.

78. Global continued to sell franchises through the first half of 2010. Perez. Dep. 105.

79. Global intended its relationship with Mahindra would be a long-term one and hoped to establish Mahindra dealerships in all 50 of the United States. Perez Dep. 82-83.

80. On June 11, 2010, Mahindra offered to refund all of the funds paid in by Global's owners in exchange for a Mahindra takeover of the distribution arrangement. Mahindra did not intend to refund money to any dealers; rather, it intended to keep some undetermined number of dealers. Global's owners rejected Mahindra's offer to repay the full amount of their investment. Perez Dep. 61-63.

81. Global's CEO, John Perez, testified that he trusted Mahindra. Perez Dep. 130.

82. Global salesman Huey testified that he never had any doubt that Mahindra would deliver the vehicles and had "every reason to believe" that Mahindra was being "straight up" with Global. Huey Dep. 27.

10

83. On June 17, 2010, Perez advised AHD in an email that it had demanded arbitration with Mahindra and had simultaneously filed a civil lawsuit against Mahindra in federal court in Atlanta. Jt. Ex. 12; Addy Tr. Testimony.

84. Through Perez, Global sent dealers an email on July 9, 2010 inviting them to attend one of several meetings scheduled in different locations throughout the United States. Jt. Ex. 13. The invitation was intended "for dealer principals only due to the confidential nature of the meeting." Jt. Ex. 13. Addy attended the meeting held in Charlotte, North Carolina on July 19, 2010. Addy Tr. Testimony. Addy testified that he learned at that meeting that there was a dispute between Mahindra and Global; that Global had filed a lawsuit and an arbitration proceeding; and that Global's interest was to protect the dealers. Addy Tr. Testimony. At the time Global decided to arbitrate against Mahindra, none of the dealers had been offered their money back. Perez Dep. 79.

85. Less than one week after Addy attended the meeting in Charlotte, he received a email from Global once again requesting Floor Plan Letters from Mahindra Dealers and reminding them they were required to purchase Mahindra diagnostic equipment and signage. Jt. Ex. 14; Addy Tr. Testimony.

86. Thereafter, Global continued to represent to AHD that Mahindra vehicles were still coming to the U.S. and encouraged AHD to purchase a $9,000 Mahindra diagnostic system from Global to service Mahindra vehicles. Jt. Ex. 14; Addy Tr. Testimony.

87. Based on concerns AHD's floor-plan financer, Allied Financial, raised about Mahindra's lack of regulatory approval from the United States, Addy became concerned that the ongoing legal issues between Global and Mahindra would prevent AHD from ever receiving any vehicles from Global or Mahindra. Addy Tr. Testimony. Accordingly, Addy decided to seek a refund of the franchise fee from Global. Addy Tr. Testimony.

88. Addy went to Global's Alpharetta, Georgia headquarters to meet with Perez and several others to seek a refund of the $195,000 fee AHD paid to Global. Addy Tr. Testimony.

89. After that November 10, 2010 meeting, Addy set a follow-up letter to Perez, again asking for a refund of the $195,000 franchise fee. Jt. Ex. 16; Addy Tr. Testimony.

90. Perez responded to Addy in a letter dated December 10, 2010. Jt. Ex. 17. In the letter, Perez advised that Global was not in a position to return the AHD dealer fee at that time, as all of Global's resources were being devoted to "the aggressive pursuit of

11

      Global Vehicles' claims against Mahindra in the United States and England." *Id.* Perez noted that if Addy had reviewed the litigation files as he represented in his letter, he would know this to be true. *Id.* Perez indicated Global's "overriding goal in pursuing these actions is to obtain vehicles for dealers such as yourself as quickly as possible." *Id.*

91. Addy did not have any further direct conversation with Perez subsequent to the December 10, 2010 letter. Addy Tr. Testimony.

92. No part of AHD's $195,000 franchise fee was ever returned. Addy Tr. Testimony.

93. Ultimately, Global's case in federal court was dismissed and Global lost its dispute with Mahindra in arbitration. Perez Dep. 18-19, 108.

94. In 2011, Global closed its business and placed its records in a storage facility in Alpharetta, Georgia. Perez Dep. 15-18.

95. Perez sold his home in Alpharetta, Georgia and moved back to Miami. Perez Dep. 4, 25.

96. Notwithstanding its receipt of tens of millions of dollars, Global never imported and distributed to any franchisee, a single Mahindra vehicle for ultimate sale to any consumer. Compl. ¶ 13; Answer ¶ 13.

III. Applicable Law and Conclusions of Law

    A. Liability

In the sole cause of action before the court, AHD seeks relief pursuant to the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act, S.C. Code Ann. § 56-15-10, *et seq*. (the "Act"), claiming Global's conduct amounted to "unfair or deceptive acts or practices" in violation of the Act. *See* Compl. ¶ 33 (citing S.C. Code Ann. § 56-15-30). In construing § 56-15-30(a), "the courts may be guided by the definitions in the Federal Trade Commission Act." S.C. Code Ann. § 56-15-30(b) (citing 15 U.S.C § 45).

Global stipulates it satisfies the Act's statutory definition of "Distributor."[4] *See* S.C. Code Ann. § 56-15-10(g) (defining "Distributor" as "any person who sells or distributes new vehicles to motor vehicle dealers or who maintains distributor representatives within the State."). Distributors, among others, violate the Act by engaging in "[u]nfair methods of competition and unfair or deceptive acts or practices." S.C. Code Ann. §§ 56-15-30(a), 56-15-40.

South Carolina's Act provides in part as follows:

> It shall be deemed a violation of paragraph (a) 56-15-30 for any . . . distributor . . . to engage in any action which is *arbitrary*, in *bad faith*, or *unconscionable* and which causes damage to any of the parties or to the public.

S.C. Code Ann. § 56-15-40(1) (emphasis added). Although the Act does not include definitions of "arbitrary," "bad faith," or "unconscionable," South Carolina's appellate courts have provided guidance. For purposes of the Act, the Supreme Court of South Carolina has defined the term "arbitrary" to include "acts which are unreasonable, capricious or nonrational; not done according to reason or judgment; depending on will alone." *Taylor v. Nix,* 416 S.E.2d 619, 621 (S.C. 1992) (citing Black's Law Dictionary) (finding what is "arbitrary conduct" to be "readily definable). For purposes of the Act, the South Carolina Court of Appeals has defined "bad faith" as:

> The opposite of good faith, generally implying or involving actual or constructive fraud, or a design to deceive or mislead another, or a neglect or refusal to [fulfill] some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.

*Estate of Carr ex rel. Bolton v. Circle S Enters., Inc.*, 664 S.E.2d 83, 88-89 (S.C. Ct. App. 2008) (quoting *State v. Griffin,* 84 S.E. 876, 877 (S.C. 1915) (internal quotation and citation omitted)). In construing other statutory schemes, South Carolina's courts have recognized "unconscionability" to be "the absence of meaningful choice on the part of one party due to one-

---

[4] Global does not concede it violated the Act.

sided contract provisions, together with terms which are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Fanning v. Fritz's Pontiac-Cadillac-Buick*, 472 S.E.2d 242, 245 (S.C. 1996) (in considering South Carolina Consumer Protection Code) (citing *Jones Leasing v. Gene Phillips and Assoc.*, 318 S.E.2d 31 (S.C. Ct. App. 1984)).

As noted above, Global concedes it was a "Distributor" for purposes of the Act during the relevant time period, S.C. Code Ann. § 56-15-10(g), and the court so holds.

The court concludes AHD has satisfied its burden of proving Global violated S.C. Code Ann. § 56-15-40(1) by engaging in actions that were arbitrary and in bad faith. For example, AHD was never provided with any information concerning Global's financial standing. Further, Global never made any disclosures to AHD regarding the homologation contingency in the contract between Global and Mahindra, either initially or subsequent to several extensions. It was only when Mahindra ended the contract with Global that AHD was made aware of the contingencies and the delays that had been taking place regarding having the vehicles approved for import into the United States. In addition, AHD was not advised that the financial institutions on which Global had planned to rely for financing the initial vehicle order from Mahindra had ceased negotiations with Global because of the uncertainty of when the vehicles would be approved for import into the United States.

In addition, Global did not advise AHD when it received the July 17, 2009 correspondence from Mahindra that it was putting "on hold" its plans to manufacture vehicles for sale in the United States. Rather, Global continued to accept vehicle orders from AHD and others and encouraged them to invest additional money in signage and to continue to pursue floor-plan financing.

14

Global's argument that Article III of the DOSSA operates to absolve it from liability to AHD for nondelivery of the vehicles—an event beyond Global's control—is unpersuasive. As made clear at trial, Plaintiff has elected to pursue remedies available under the Act, rather than proceed with its breach-of-contract-accompanied-by-a-fraudulent-act claim. Accordingly, the terms of the contracts between the parties does not operate as a bar to liability. In addition, Global's technical failure to deliver vehicles to AHD is not the only conduct as to which AHD sues Global.[5] Addy testified that AHD was not seeking recovery from Global for non-delivery of products to AHD. Rather, AHD seeks the return of the franchise fee paid.

Global's acts toward AHD violate the Act and plainly harmed AHD. Accordingly, the court now considers Plaintiff's requested damages.

B.  Damages

In pertinent part, the Act provides the following regarding available damages:

> (1) In addition to temporary or permanent injunctive relief as provided in Section 56-15-40(3)(c), any person who shall be injured in his business or property by reason of anything forbidden in this chapter may sue therefor in the court of common pleas and *shall* recover double the actual damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
> (2) . . .
> (3) In an action for money damages, if the jury finds that the defendant acted maliciously, the jury *may* award punitive damages not to exceed three times the actual damages.

S.C Code Ann. § 56-15-110 (emphasis added).

AHD sets forth damages of $195,000, the amount paid to Global. *See* Jt. Ex. 2. The court finds AHD has been "injured in [its] business or property" by acts prohibited under the Act. The $195,000 is a liquidated amount not challenged by Global. Accordingly, the Act's mandatory

---

[5] Although not the focus of Global's defense, the court is aware that S.C. Code Ann. § 56-15-40(3)(a) includes a proviso that a failure to deliver vehicles caused by circumstances beyond a distributor's control is not considered a violation of the Act.

language requires that AHD be awarded double that amount ($390,000), as well as costs and attorneys' fees. S.C Code Ann. § 56-15-110.

AHD also seeks punitive damages, which the Act permits, but does not mandate, if the factfinder determines Global acted "maliciously." S.C. Code Ann. § 56-15-110(3). The term "maliciously" is not defined in the Act. Further, the court is unaware of any South Carolina case law providing a definition of the term. Nonetheless, the court finds that term readily understandable and definable. *Cf. Taylor,* 416 S.E.2d at 621 (finding "arbitrary conduct" proscribed by the Act to be "readily definable"). Black's Law Dictionary defines "malicious" as being "1. Substantially certain to cause injury. 2. Without just cause or excuse." MALICIOUS, Black's Law Dictionary (9th ed. 2009). In considering malicious prosecution claims, South Carolina courts have defined malice "as the deliberate, intentional doing of an act without just cause or excuse." *Pallares v. Seinar*, 756 S.E.2d 128, 131 (2014) (internal quotations and citations omitted). "Malice does not necessarily mean a defendant acted out of spite, revenge, or with a malignant disposition, although such an attitude certainly may indicate malice. *Id.* To prove punitive damages are appropriate, Plaintiff has the burden of proving punitive damages by clear and convincing evidence. *See* S.C. Code Ann. § 15-33-135.

Here, the court finds AHD has not established by clear and convincing evidence that Global's actions were malicious. Global provided evidence that it expected and intended to have a long-term relationship with Mahindra and intended to comply with the DSSA. Global did not accept Mahindra's offer to return Global's original investment, noting Mahindra did not plan to refund the dealers' investments to them. AHD is not entitled to punitive damages.

IV.     Conclusion and Order

In conclusion, the court finds the following:

Plaintiff's cause of action for breach of contract accompanied by a fraudulent act is dismissed with prejudice;

Global's conduct in its relationship with AHD violated the Act and judgment shall be entered in favor of AHD against Global for the sum of $390,000 reflecting double the actual damages sustained;[6] and

Pursuant to S.C Code Ann. § 56-15-110(3), Plaintiff is entitled to costs and attorneys' fees in an amount to be determined. No later than **October 14, 2014**, counsel for AHD shall submit an appropriately supported motion for attorneys' fees and application for costs in accordance with applicable case law, such as *Grissom v. Mills Corp.*, 549 F.3d 313 (4th Cir. 2008); the Federal Rules of Civil Procedure; and this court's local civil rules, *see, e.g.*, Fed. R. Civ. P. 54(d)(2)(B); Local Civ. R. 54.02, 54.03 (D.S.C).

IT IS SO ORDERED.

September 30, 2014                                          Kaymani D. West
Florence, South Carolina                                    United States Magistrate Judge

---

[6] The Clerk of Court is instructed to enter judgment in favor of AHD pursuant to Rule 58, Federal Rules of Civil Procedure.